IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

7-ELEVEN, INC.,

              Plaintiff,

     v.

MAIA INVESTMENT COMPANY, INC.
et al.,

           Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 14-8006 (JBS/JS)

**OPINION**

APPEARANCES:

Stephen Sussman, Esq.
LEBENSFELD SHARON & SCHWARTZ P.C.
140 Broad Street
Red Bank, NJ 07701
    -and-
Adrienne Noel Gittens, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
    -and-
Sheila Raftery Wiggins, Esq.
DUANE MORRIS LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 1800
Newark, NJ 07102
    Attorneys for Plaintiff 7-Eleven, Inc.

Steven E. Angstreich, Esq.
Amy Robin Brandt, Esq.
WEIR & PARTNERS LLP
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08043
    Attorneys for Defendants Maia Investment Company, Inc.,
    Nashwa Younes, Sam Younes, Mohammad Younes, and Kathy
    Morgan

**SIMANDLE, Chief Judge:**

## I.   INTRODUCTION

This matter comes before the Court upon a motion to dismiss by Defendants Maia Investment Company, Inc., Nashwa Younes, Sam Younes, Mohammad Younes, and Kathy Morgan. [Docket Item 29.] In this trademark infringement action, Plaintiff 7-Eleven, Inc. ("7-Eleven") alleges that Defendants conspired to sell 7-Eleven branded products at a competing convenience store. Specifically, 7-Eleven contends that Sam Younes, a 7-Eleven franchisee, provided 7-Eleven proprietary products, including Cheeseburger Bites, BIG BITE hot dogs, Buffalo Chicken Rollers, and Buffalo Chicken Taquitos, for sale at the "24-7 Foodmart" in Cherry Hill, New Jersey, owned and operated by Maia Investment Company, Inc. ("Maia"). Sam Younes' wife, Nashwa Younes, is Maia's president and his son, Mohammad Younes, is Maia's vice-president. Defendant Kathy Morgan is the manager of the 24-7 Foodmart where the alleged infringement occurred. Defendants seek dismissal of 7-Eleven's claims for fraud, conspiracy, and trademark infringement, and request that the Court decline to exercise supplemental jurisdiction over 7-Eleven's breach of contract claim against Sam Younes.

For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion to dismiss.

## II.   BACKGROUND

### A.   Facts

The Court accepts as true for purposes of the instant motion the following facts alleged in 7-Eleven's Amended Complaint. Plaintiff 7-Eleven franchises the 7-Eleven chain of convenience stores. (Am. Compl. [Docket Item 21] ¶ 16.) Defendant Sam Younes executed Store Franchise Agreements ("Franchise Agreements") with 7-Eleven for each of his three 7-Eleven stores located at the following addresses: 1440 Brace Road, Cherry Hill, New Jersey; 610 Kresson Road, Cherry Hill, New Jersey; and 340 North Broadway Avenue, Pittman, New Jersey. (Id. ¶¶ 25-28.) The 24-7 Foodmart, owned and operated by Maia, is located at 1498 Haddonfield-Berlin Road, Cherry Hill, New Jersey, no more than 1.1 miles from Sam Younes' Brace Road and Kresson Road stores. (Id. ¶¶ 10, 29.)

### 1.   The franchise arrangement, generally

Under a typical 7-Eleven franchise arrangement, 7-Eleven leases its franchisees "a complete 'turn-key' physical plant ready for retail operation," which includes the store, fixtures, and equipment. (Id. ¶ 30.) A franchisee may, on a weekly basis, draw from the net income from the store's operations – the amount remaining after deducting from gross profit both "operating expenses" (e.g. payroll) and the 7-Eleven Charge. (Id. ¶ 31.) The 7-Eleven Charge is a percentage of the gross

3

profit (net sales less cost of goods sold), usually between 50 and 52 percent, established in the franchise agreement. (Id. ¶ 32.)

As part of the Franchise Agreements between 7-Eleven and Sam Younes, 7-Eleven licensed for "use the 7-ELEVEN name and mark, and related trademarks, trade dress and systems of operations" (collectively, "Marks"). (Id. ¶ 33.) Pursuant to Paragraph 7(b) of the Franchise Agreements, Sam Younes agreed that he is not authorized to "operate the Store or to offer or sell any products or services offered and sold by 7-Eleven Stores at or from any location other than the Store location identified in [the franchise agreement] or through any other channel or method of distribution other than a 7-Eleven Store, including by or through the Internet or similar electronic media." (Id. ¶ 34.) As to 7-Eleven's trademarks, Sam Younes agreed that:

> (a) 7-Eleven is the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them;
> (b) The franchisee will not take any action that would prejudice or interfere with 7-Eleven's rights in and to the Marks;
> (c) All goodwill arising from the franchisee's use of the Marks will inure solely and exclusively to 7-Eleven's benefit; and
> (d) Any unauthorized use of the Marks will constitute an infringement of 7-Eleven's rights in the Marks.

(Id. ¶ 35.) Sam Younes further agreed that he shall not:

4

> (a) Make, support or help another to make use of any name, trademark, service mark, trade dress or other visual or audible material which is not expressly permitted by this Agreement and comprises in part the numeral "7" or the term "eleven" or is otherwise likely to cause confusion with or dilute the distinctiveness of the Marks; or
> (b) Commit any other act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, or any of 7-Eleven's rights in or to the Marks, the 7-Eleven Image, or the 7-Eleven System.

(Id. ¶ 36.) Sam Younes also agreed to immediately notify 7-Eleven of any apparent infringement of its Marks and to take all reasonable action necessary to protect 7-Eleven's interest in same. (Id. ¶ 37.)

In addition to providing the physical plant to the franchisee, 7-Eleven also provides financing to operate the store, and Sam Younes availed himself of such financing. (Id. ¶ 38.) To secure financing, each franchisee executes a security agreement by which 7-Eleven retains a security interest in the store inventory and associated proceeds. (Id. ¶ 39.) The franchisee may purchase inventory by paying a portion of the purchase price and using 7-Eleven's financing to cover the balance. (Id. ¶ 40.) The balance due to 7-Eleven at any point in time is reflected in an account defined in the franchise agreement as the "Open Account," which includes any inventory, purchases, and expenses financed through 7-Eleven and the proceeds from all sales. (Id.)

### 2.   The franchisee's reporting obligations

The franchise agreement requires franchisees to accurately record and report to 7-Eleven all store activity. Franchisees are required to submit a daily cash report and make daily cash deposits of receipts into a designated 7-Eleven bank account. (Id. ¶ 44.) The daily cash report documents the amount of sales for each day as recorded on the cash register, as well as any deductions to or from cash that affects the daily deposit. (Id. ¶ 45.) 7-Eleven uses the daily cash reports to prepare monthly financial summaries for each store, which reflect the 7-Eleven Charge and the outstanding balance of the Open Account. (Id. ¶¶ 48-49.) The franchisee is required to maintain a minimum "Net Worth," defined in the franchise agreement as all assets, less the franchisee's payables and secured obligations from the operation of the store, including any Open Account indebtedness to 7-Eleven. (Id. ¶ 50.) The franchisee may take a weekly draw so long as their Net Worth remains above the required minimum. (Id. ¶ 51.)

### 3.   Inventory purchases

Franchisees make inventory purchases in two ways: 1) inventory vendors submit invoices electronically to be paid directly by 7-Eleven, or 2) a franchisee pays vendors for inventory directly with cash from the store's receipts. (Id. ¶¶ 53-54.) In the latter circumstance, the franchisee must record

6

the cash payment on the daily cash report and provide 7-Eleven with the related invoice. (Id. ¶ 54.)

### 4.    7-Eleven's retail accounting method

7-Eleven utilizes the retail method of inventory accounting. (Id. ¶ 55.) When a 7-Eleven store begins operations, the inventory is valued "at retail" (i.e., the retail sale price of each inventory item as determined by the franchisee). (Id.) When a franchisee purchases merchandise for the store, the franchisee must provide 7-Eleven with the invoice, as well as the retail value of the purchased merchandise. (Id. ¶ 56.) 7-Eleven increases the retail book inventory by the retail value of the merchandise purchased. (Id.) Correspondingly, reported sales of merchandise reduce the retail book inventory. (Id.) Failure to report sales of merchandise results in an inventory "shortage" because the retail book inventory does not reflect the amount by which the actual retail inventory has been reduced. (Id.)

Consequently, accurate reporting by franchisees is essential to the operation of 7-Eleven's franchises and is required to properly calculate gross profit and the 7-Eleven Charge which is derived therefrom. (Id. ¶ 58.)

### 5.    Defendants' alleged misconduct

7-Eleven alleges that Defendants conspired to sell 7-Eleven branded and proprietary products from Sam Younes' 7-Eleven

stores at the 24-7 Foodmart convenience store owned and operated by Maia. (Id. ¶ 59.) Between July and December, 2014, 7-Eleven personnel visited the 24-7 Foodmart on multiple occasions and observed "substantial amounts" of 7-Eleven branded, proprietary, and exclusive merchandise being offered for sale, including 7-Eleven grill products (Cheeseburger Bites, Buffalo Chicken Rollers, BIG BITE hot dogs, Kielbasa, and Buffalo Chicken Taquitos) displayed with 7-Eleven's proprietary roller grill product identifiers.[1] (Id. ¶¶ 60-66.) On one occasion, 7-Eleven personnel allegedly purchased an entire case of 7-Eleven proprietary Cheeseburger Bites in packaging bearing 7-Eleven Marks. (Id. ¶ 63.)

7-Eleven alleges that the 7-Eleven products offered for sale at the 24-7 Foodmart "were sourced from the Younes 7-ELEVEN Stores with the knowledge and participation and/or knowing acquiescence of each of the Defendants." (Id. ¶ 67.) Moreover, Defendants failed to report to 7-Eleven the sale of the 7-Eleven merchandise at the 24-7 Foodmart and failed to remit any proceeds from the sales to 7-Eleven. (Id. ¶ 72.) Defendants deliberately concealed these sales from 7-Eleven. (Id.) According to 7-Eleven, the unauthorized sale of 7-Eleven branded

---

[1] 7-Eleven contends that its representatives obtained video and photographic evidence of same. (Id. ¶ 61.)

products and the use of 7-Eleven Marks is likely to cause confusion. (Id. ¶ 71.)

**B.   Procedural history**

On December 23, 2014, 7-Eleven filed a one-count Complaint against Maia and Nashwa Younes for trademark infringement. [Docket Item 1.] On December 29, 2014, 7-Eleven filed a motion for preliminary injunction seeking to enjoin the allegedly infringing conduct at the 24-7 Foodmart. [Docket Item 4.] Following a telephone conference with the Court, the parties submitted, and the Court approved, a consent order granting 7-Eleven a permanent injunction.[2] [Docket Item 18.] Following the telephone conference, the Court also permitted 7-Eleven to serve expedited discovery requests, limited to five interrogatories, regarding the source of the allegedly infringing products at issue. [Docket Item 16.] Thereafter, on January 23, 2015, 7-Eleven filed a four-count Amended Complaint adding as defendants Sam Younes, Mohammad Younes, Kathy Morgan, and John Does 1-10. [Docket Item 21.] 7-Eleven asserts claims for trademark infringement and conspiracy against all defendants, as well as claims for fraud and breach of contract against Sam Younes.[3]

---

[2] Consistent with the consent order, Defendants submitted the affidavit of Mohammad Younes which estimated that the 24-7 Foodmart sold at retail less than $2,026.08 of 7-Eleven merchandise. (Def. Ex. B [Docket Item 29-3] ¶ 7.)

[3] The Court is mindful of Defendants' contention that this action should have been raised as a counterclaim in ongoing litigation

The instant motion to dismiss followed. [Docket Item 29.] 7-Eleven filed opposition [Docket Item 34] and Defendants filed a reply. [Docket Item 35.]

## III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

---

in this District between Sam Younes and 7-Eleven, specifically, Younes v. 7-Eleven, Inc., Civ. No. 13-3500, in which Sam Younes and his co-plaintiff allege that 7-Eleven created hostile conditions and fabricated evidence in a concerted effort to force the termination of their franchise agreements. Plaintiffs in Civ. No. 13-3500 assert claims for violations of the New Jersey Franchise Practices Act, breach of the covenant of good faith and fair dealing, and interference with prospective economic advantage.

## IV.   DISCUSSION

Defendants argue that 7-Eleven's fraud claim is barred under New Jersey law by the economic loss doctrine; that the civil conspiracy claim fails because the fraud claim fails and because 7-Eleven has only pleaded conclusory allegations as to each defendants' role in the conspiracy, except Sam Younes; and that the trademark infringement claims fails under the first sale doctrine because the allegedly infringing goods are genuine and there could be no confusion to consumers. Defendants also contend that 7-Eleven lacks standing to assert a claim for trademark infringement because 7-Eleven has not identified any injury as a result of the alleged infringement. Assuming dismissal of 7-Eleven's other claims, Defendants request that the Court decline to exercise supplemental jurisdiction over 7-Eleven's breach of contract claim. The Court will address each claim and argument in turn.

### A.   7-Eleven's fraud claim is barred by the economic loss doctrine under New Jersey law

"The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." Chen v. HD Dimension Corp., Civ. 10-863, 2010 WL 4721514, *8 (D.N.J. Nov. 15, 2010). State and federal courts have repeatedly recognized that New Jersey law remains unsettled as to whether the economic loss doctrine bars

11

a claim for fraud where the alleged fraud is circumscribed by a contract between the parties. See, e.g., Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 144 (3d Cir. 2001) abrogated on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers, 134 S. Ct. 773, 187 L. Ed. 2d 669 (2014) (describing the unsettled application of the economic loss doctrine to fraud claims based on the same underlying facts a contract claim as "very complex and troublesome"); Montclair State Univ. v. Oracle USA, Inc., Civ. 11-2867 (FLW), 2012 WL 3647427, at *5 (D.N.J. Aug. 23, 2012) (noting that the New Jersey Supreme Court has "not expressed its view on what precise sort of fraud claims may proceed alongside breach of contract claim and requesting guidance from the New Jersey Supreme Court); Q Capital Corp. v. Wilmington Trust Co., No. A-2780-05T5, 2007 WL 93231, at *3 (N.J. Super. Ct. App. Div. Jan. 12, 2007).

Although the New Jersey Supreme Court has yet to resolve the question, courts in this District consistently distinguish between fraud in the inducement and fraud in the performance of a contract. See RNC Sys., Inc. v. Modern Tech. Grp., Inc., 861 F. Supp. 2d 436, 451 (D.N.J. 2012) ("Fraud claims can proceed alongside breach of contract claims where there exists fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations.") (quoting Barton v. RCI,

12

LLC, Civ. 10–3657, 2011 WL 3022238, *7 (D.N.J. July 22, 2011));
Chen, 2010 WL 4721514, at *8 ("[W]hether a tort claim can be
asserted alongside a breach of contract claim depends on whether
the tortious conduct is extrinsic to the contract between the
parties."); Bracco Diagnostics, Inc. v. Bergen Brunswig Drug
Co., 226 F. Supp. 2d 557, 563 (D.N.J. 2002) ("The distinction
between fraud in the inducement and fraud in the performance of
a contract remains relevant to the application of the economic
loss doctrine in New Jersey."). See also G & F Graphic Servs.,
Inc. v. Graphic Innovators, Inc., Civ. 13-6482 (JEI), 2014 WL
1818235 (D.N.J. May 8, 2014) (recognizing distinction between
fraud in the inducement and fraud in the performance).

     "Courts have continued to affirm 'the conceptual
distinction between a misrepresentation of a statement of intent
at the time of contracting, which then induces detrimental
reliance on the part of the promisee, and the subsequent failure
of the promisor to do what he has promised.'" Bracco, 226 F.
Supp. 2d at 563 (quoting LoBosco v. Kure Eng'g Ltd., 891 F.Supp.
1020, 1032 (D.N.J. 1995)). Under this formulation, "where the
fraud alleged is contained within the four corners of the
contract, that is, where it concerns the nonfulfillment of a
warranty or a guarantee contained in the contract, the plaintiff
is prohibited from pursuing a separate tort claim; but, where
the fraud is extrinsic to the contract, that is, where it more

closely resembles a 'fraud in the inducement' claim, then the plaintiff is not prohibited from pursuing simultaneous tort and contract claims." <u>Lithuanian Commerce Corp. v. Sara Lee Hosiery</u>, 219 F. Supp. 2d 600, 607 (D.N.J. 2002).

As in <u>Montclair</u>, in the absence of direction from the New Jersey Supreme Court or state appellate courts, this Court will follow the reasoning of courts in this District which distinguish between conduct extrinsic or intrinsic to the contract. <u>Montclair</u>, 2012 WL 3647427, at *6, *10 (noting that "the Third Circuit has made clear that where the scope of state law is unsettled, federal courts are to adopt the approach that limits recovery rather than expands it").

In the present action, 7-Eleven's fraud claim against Sam Younes involves conduct explicitly addressed in the Franchise Agreements between the parties. The fraud claim is thus entirely derivative of Sam Younes' contractual duties as defined in the Franchise Agreements. Specifically, Count II of the Amended Complaint alleges that Sam Younes submitted to 7-Eleven inaccurate inventory and sales records. 7-Eleven's allegations in the Amended Complaint make clear that Sam Younes agreed upon signing his Franchise Agreements to accurately record all inventory and sales data and failure to do so would result in a breach of his contractual duties because accurate reporting by franchisees is necessary to properly calculate 7-Eleven's share

14

of gross profit. (Am. Compl. ¶ 58.) 7-Eleven's fraud claim is thus premised on fraud in the performance of the Franchise Agreement, not fraud in the inducement. Under New Jersey law as interpreted by courts in the District, such a fraud claim is barred by the economic loss doctrine. Therefore, the Court will grant Defendants' motion to dismiss as to 7-Eleven's fraud claim against Sam Younes.[4]

## B.    7-Eleven's conspiracy claim must be dismissed for lack of an underlying unlawful act

The New Jersey Supreme Court has required the following to state a claim for civil conspiracy under New Jersey law:

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

_____

[4] The Court recognizes that in considering whether the economic loss doctrine precludes a fraud claim courts in this District have examined whether the contract between the parties limits the remedies for breach. See, e.g., Florian Greenhouse, Inc. v. Cardinal IG Corp., 11 F. Supp. 2d 521, 528 (D.N.J. 1998); Lo Bosco v. Kure Eng'g Ltd., 891 F. Supp. 1020, 1033 (D.N.J. 1995). 7-Eleven, in the present action, notes that it seeks punitive damages through its fraud claim, which are unavailable under its contract claim, and that there is no contractual provision limiting 7-Eleven's remedies or damages against Sam Younes. However, 7-Eleven fails to support this statement with any reference to the Amended Complaint or the Franchise Agreements between the parties. The Court thus finds 7-Eleven's argument insufficient to salvage a fraud claim which is otherwise squarely precluded under the weight of precedent in this District.

Banco Popular North America v. Gandi, 184 N.J. 161, 177 (2005).
Thus, to state a claim for civil conspiracy, a plaintiff must
allege that the defendant (1) entered into an agreement with at
least one other person, (2) for the purpose of committing an
unlawful act, and (3) one of the conspirators then took at least
one overt act in furtherance of the agreement, and (4) plaintiff
suffered some damage as a result. Warren v. Fisher, Civ. 10-
5343, 2011 WL 4073753, at *3 (D.N.J. Sept. 12, 2011). "[T]he
gist of the claim is not the unlawful agreement, but the
underlying wrong which, absent the conspiracy, would give a
right of action." Gandi, 184 N.J. at 177–78 (internal quotation
omitted). In the present case, 7-Eleven's conspiracy claim
against all Defendants is premised on their alleged role in
aiding and abetting the alleged fraud committed by Sam Younes.
However, as discussed above, 7-Eleven's fraud claim against Sam
Younes is barred by the economic loss doctrine. Without an
underlying wrong, 7-Eleven cannot state a claim for conspiracy.
See Howmedica Osteonics Corp. v. Zimmer, Inc., Civ. 11-1857,
2012 WL 5554543, at *15 (D.N.J. Nov. 14, 2012) (dismissing civil
conspiracy claim where court found fraud claim barred by the
economic loss doctrine); Reese v. Horizon Blue Cross Blue Shield
of New Jersey, Civ. 08–1382, 2008 WL 5188853, at *3 (D.N.J. Dec.

10, 2008). Therefore, the Court will grant Defendants' motion to dismiss as to 7-Eleven's conspiracy claim.[5]

### C. 7-Eleven has not alleged sufficient facts regarding the likelihood of confusion to state a claim for trademark infringement

Defendants argue that 7-Eleven's allegations fail to state a cognizable claim for trademark infringement because the "first sale" doctrine precludes a claim for trademark infringement where a defendant merely resells a genuine product. Count I of the Amended Complaint asserts violations of Section 32, 15 U.S.C. § 1114,[6] Section 34, 15 U.S.C. § 1116(d)(1)(B),[7] and Section 43(a), 15 U.S.C. § 1125(a),[8] of the Lanham Act. 7-

---

[5] The Court also notes that 7-Eleven's allegations as to the alleged roles of Defendants, other than Sam Younes, in any conspiracy are entirely conclusory and thus must be disregarded under Iqbal. See Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009). For example, the Amended Complaint fails to include allegations as to the specific conduct of each defendant in furtherance or support of Sam Younes' alleged fraudulent misrepresentations to 7-Eleven.

[6] 15 U.S.C. § 1114 provides in pertinent part that
    (1) Any person who shall, without the consent of the registrant--
    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.
15 U.S.C. § 1114.

[7] The Court finds that 7-Eleven's request for injunctive relief under 15 U.S.C. § 1116 is moot in light of the permanent injunction entered by consent on January 16, 2015. [Docket Item 18.]

[8] 15 U.S.C. § 1125 provides in pertinent part that

Eleven's claims for trademark infringement and false designation of origin both require that Defendants' use of the trademark to identify its goods or services was likely to create confusion concerning the origin of those goods or services. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Food Sciences Corp. v. Nagler, Civ. 09-1798 (JBS), 2010 WL 1186203, at *6 (D.N.J. Mar. 22, 2010).

Under the first sale doctrine, "a trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain control over who buys, sells, and uses the product in its authorized form." Iberia Foods Corp. v. Romeo, 150 F.3d 298, 301 n.4 (3d Cir. 1998); Sebastian Int'l v. Longs Drug Stores Corp., 53 F.3d 1073, 1074 (9th Cir. 1995), cert. denied, 516 U.S. 914

---

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

18

(1995) ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition."). The mere resale of genuine goods, without more, does not state a claim for trademark infringement because there is no confusion about the product if the goods sold are genuine.[9] Sebastian, 53 F.3d at 1076; see also Food Sciences Corp. v. Nagler, Civ. 09-1798 (JBS), 2010 WL 1186203, at *7 (D.N.J. Mar. 22, 2010).

As this Court noted in Nagler, however, "[t]his does not mean that sellers of genuine goods are therefore immune from trademark liability." Id. "There are other kinds of confusion against which the statutes guard, and there are several varieties of cases permitting trademark claims even though the product sold is otherwise genuine." Id.; see also Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1237 (10th Cir. 2006) (reseller purchased products by deceptive means); Bandag, Inc. v. Al Bolser's Tire Stores, 750 F.2d 903, 913 (Fed. Cir. 1984) (reseller's advertising suggested it was one of the producer's franchisees); Stormor v. Johnson, 587 F.Supp. 275, 279 (W.D.

---

[9] 7-Eleven does not allege that the products at issue offered for sale at the 24-7 Foodmart were anything but genuine 7-Eleven branded and proprietary products. To the contrary, the genuine, unaltered nature of the products appears to be the basis for 7-Eleven's claims. It is noteworthy, however, that 7-Eleven reveals in a footnote in its opposition brief that it could plead additional facts showing that certain products sold at the 24-7 Foodmart were not genuine.

Mich. 1984) (reseller used trademark for advertising). These cases involve consumer confusion other than confusion over whether the product itself is the genuine article, including confusion as to affiliation, connection, or sponsorship. See 4 McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed.) (discussing different types of actionable confusion under the statute). Indeed, decisions by the Court of Appeals, subsequent to Iberia, which recognize claims based on other kinds of confusion, suggest that Iberia does not foreclose a confusion claim such as that presented here based on alleged sponsorship confusion.[10] See, e.g., McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 358 (3d Cir. 2007) (citing 4 McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed.)).

The plausibility of 7-Eleven's trademark infringement claim thus turns on whether 7-Eleven has adequately alleged a

---

[10] The Court is unpersuaded by 7-Eleven's argument that the first sale doctrine does not apply because this doctrine presupposes an authorized first sale which is absent from this case. Far from "unambiguous[]," the Amended Complaint merely alleges that the 7-Eleven branded products "were sourced from the Younes 7-ELEVEN Stores." (Am. Compl. ¶ 4; see also id. ¶¶ 12, 67.) Because these allegations do not preclude the possibility that the 7-Eleven products were acquired through an authorized first sale, the Court cannot, based on the pleadings, conclude that the first sale doctrine is inapplicable for lack of an authorized first sale. As such, the Court need not address the parties' dispute as to whether the first sale doctrine requires an authorized first sale.

likelihood of confusion.[11] "The assessment of likelihood of confusion in a sponsorship confusion claim differs from that assessment for infringing marks in two ways: the defendant must take some action that causes confusion beyond displaying and selling the product, and only some of the ordinary factors for assessing that confusion will be applicable." Food Sciences Corp. v. Nagler, Civ. 09-1798 (JBS), 2010 WL 4226531, at *3 (D.N.J. Oct. 20, 2010). 7-Eleven appears to argue that Defendants' resale of 7-Eleven branded products without more is sufficient to allege a likelihood of confusion because the sale of such products, exclusively sold at 7-Eleven stores, "inherently suggest[s] an affiliation with or sponsorship by 7-Eleven that is likely to confuse consumers." (Pl. Opp. [Docket Item 34] at 10.) This Court rejected a similar argument in Nagler, and 7-Eleven has provided no support for such an argument in the present action. Absent authority endorsing the contention that resale of certain products is inherently likely to confuse consumers, the Court is bound by well-settled law that mere display and resale of a genuine product does not

---

[11] To prove trademark infringement and unfair competition under the Lanham Act, a plaintiff must establish the following: (1) plaintiff owns the mark; (2) the mark is valid and legally protectable; and (3) defendant's use of the mark to identify goods or services is likely to create confusion. Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 279 (3d Cir. 2001). There is no dispute that 7-Eleven has adequately alleged the first two elements.

violate the Lanham Act. See Iberia Foods Corp. v. Romeo, 150
F.3d 298, 301 n.4 (3d Cir. 1998); see also Brilliance Audio,
Inc. v. Haights Cross Commc'ns, Inc., 474 F.3d 365, 369 (6th
Cir. 2007); Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53
F.3d 1073, 1076 (9th Cir. 1995).

The Court finds its previous decision in Nagler
instructive. See Food Sciences Corp. v. Nagler, Civ. 09-1798
(JBS), 2010 WL 1186203 (D.N.J. Mar. 22, 2010). In Nagler,
plaintiff asserted claims for trademark infringement against
defendant, a former authorized distributor of plaintiff's
products, based on his sale of plaintiff's dietary food
supplements through his website. Id. at *1. The products at
issue were sold exclusively to medical professionals who then
monitored the use of such products as part of diet programs. Id.
As such, plaintiff's products were not offered for sale on the
Internet. Id. This Court initially dismissed plaintiff's
trademark infringement claims because the allegations in the
complaint suggested that defendant did nothing "more than
identify genuine NUTRIMED products by name on the website, among
other products, and sell genuine NUTRIMED products to willing
buyers." Id. at *9.

This Court subsequently permitted plaintiff's amended
complaint to proceed based on newly pleaded facts regarding
plaintiff's distribution system and defendant's website. Food

22

Sciences Corp. v. Nagler, Civ. 09-1798 (JBS), 2010 WL 4226531, at *9 (D.N.J. Oct. 20, 2010). The Court emphasized the fact that defendant was previously an authorized distributor of plaintiff's products, that he used possessive language on the website when referring to plaintiff's products, and that plaintiff's products were the only brand name products listed on the website. Id. While recognizing that defendant had done "very little to potentially confuse consumers beyond simply stocking, displaying, and reselling a genuine product," the Court could not conclude that no reasonable fact-finder could find a likelihood of confusion. Id.

In the present action, 7-Eleven alleges that 7-Eleven's franchise agreements prohibit the sale of 7-Eleven products in any location other than 7-Eleven stores or through any alternative distribution method. (Am. Compl. ¶ 34.) According to 7-Eleven, it thus follows that 7-Eleven products are exclusively sold at 7-Eleven stores. Nevertheless, Defendants allegedly sold 7-Eleven products at the 24-7 Foodmart, including 7-Eleven's proprietary grill products: Cheeseburger Bites, Buffalo Chicken Rollers, and BIG BITE hot dogs. (Id. ¶ 62.) Defendants allegedly displayed these products with "7-Eleven's proprietary roller grill product identifiers." (Id. ¶¶ 64-66.) On one occasion, 7-Eleven representatives purchased an "entire case of 7-Eleven proprietary Cheeseburger Bites in packaging bearing 7-Eleven

23

marks." (Id. ¶ 63.) Beyond these allegations, the Amended
Complaint refers only in conclusory fashion to Defendants' use
of 7-Eleven's marks and logos.

The Amended Complaint thus alleges almost nothing beyond
the mere resale of 7-Eleven's products. Importantly, neither the
Amended Complaint, nor 7-Eleven's briefing, describes with any
specificity the "proprietary roller grill product identifiers."
It is conceivable that these "identifiers" could be construed as
advertising and labeling exclusively used by 7-Eleven, which
might constitute conduct by Defendants beyond merely reselling
7-Eleven's products. However, without additional facts
clarifying the nature, location, quantity, and prominence of
these identifiers, including whether and in what manner they
bear 7-Eleven's logo, the Court declines to speculate as to
whether they were likely to confuse consumers as to sponsorship
or affiliation. Indeed, besides 7-Eleven's contention that the
sale of 7-Eleven's exclusive products is inherently confusing,
which the Court rejected above, the use of these identifiers is
the sole allegation in the Amended Complaint which could
conceivably distinguish Defendants' conduct from mere display
and resale of 7-Eleven's genuine products. The Amended Complaint
contains no facts about other products sold at the 24-7 Foodmart
or how the 7-Eleven products were displayed, in terms of
position and quantity, as compared to other products in the

24

store. As pleaded, this action more closely resembles the facts
in Nagler prior to amendment where plaintiff alleged nothing
more than defendant's identification of plaintiff's products by
name on his website and the sale of these genuine products to
willing buyers. Food Sciences Corp. v. Nagler, Civ. 09-1798
(JBS), 2010 WL 1186203, at *9 (D.N.J. Mar. 22, 2010).
Accordingly, the facts as alleged in the Amended Complaint fall
short of those necessary to support a claim for trademark
infringement based on sponsorship confusion.[12] See Volkswagenwerk
Aktiengesellschaft v. Volks City, Inc., 348 F.2d 659, 660 (3d
Cir. 1965) (upholding grant of preliminary injunction where
defendant car dealer's newspaper advertisements including
plaintiff's trademark were "clearly intended to convey the
impression of affiliation with the plaintiff"); Brain Pharma,
LLC v. Scalini, 858 F. Supp. 2d 1349, 1354 (S.D. Fla. 2012)
(finding pleadings insufficient to support trademark
infringement claim where defendants merely sold plaintiff's
products on their website); Stormor, a Div. of Fuqua Indus.,
Inc. v. Johnson, 587 F. Supp. 275, 279 (W.D. Mich. 1984)

---

[12] As Defendants note, 7-Eleven has not alleged actual confusion
as the result of Defendants' conduct. Moreover, neither party
has addressed the Lapp factors used in the Third Circuit to
determine the likelihood of confusion. See Sabinsa Corp. v.
Creative Compounds, LLC, 609 F.3d 175, 182 (3d Cir. 2010)
(citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d
Cir. 1983)).

(finding that defendants' use of plaintiff's promotional literature which had been stamped with defendants' names to advertise and use of plaintiff's trademarks at trade show and in print advertisement supported a likelihood of confusion).[13] Therefore, the Court will grant Defendants' motion to dismiss as to 7-Eleven's claims for trademark infringement.

Because the Court finds that amendment may not be futile, 7-Eleven will be permitted an opportunity to file an amended complaint curing the deficiencies identified above.[14]

**D.   7-Eleven has adequately pleaded diversity jurisdiction**

Defendants argue that the Court should decline to exercise supplemental jurisdiction over 7-Eleven's breach of contract claim against Sam Younes given the insufficiency of 7-Eleven's trademark infringement claims. In response, 7-Eleven contends that this Court's subject matter jurisdiction is not limited to federal question and that 7-Eleven has also adequately alleged diversity jurisdiction. The Court agrees.

---

[13] Certainly this is not a case in which a former franchisee continues to use franchise trademarks after their franchise agreement has been terminated. See, e.g., 7-Eleven, Inc. v. Khan, 977 F. Supp. 2d 214, 230 (E.D.N.Y. 2013); 7-Eleven, Inc. v. Grewal, Civ. 14-12676 (MGM), 2014 WL 6604717, at *4 (D. Mass. Nov. 20, 2014).

[14] Upon re-pleading, 7-Eleven will also have an opportunity to clarify the specific harm suffered as the result of Defendants' alleged trademark infringement and the role of each defendant in the allegedly infringing conduct.

To establish diversity jurisdiction under 28 U.S.C. § 1332, a plaintiff must show not only diversity of citizenship, but also that the amount in controversy exceeds $75,000 exclusive of interests and costs. 28 U.S.C. § 1332(a). "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that . . . the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." Feuerstein v. Simpson, 582 F. App'x 93, 98 (3d Cir. 2014) (quoting St. Paul Mercury Indemnity v. Red Cab Co., 303 U.S. 283, 288-89 (1938)). This test requires only minimal scrutiny by the Court and the sole inquiry is whether the plaintiff can recover more than $75,000. Suber v. Chrysler Corp., 104 F.3d 578 (3d Cir. 1997). In other words, "[i]n diversity cases, [courts] generally accept a party's good faith allegation of the amount in controversy." Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir. 1995). Therefore, dismissal based on failure to satisfy the amount in controversy requirement is only warranted "if, from that face of the complaint, it is a 'legal certainty' that the plaintiff cannot recover $75,000, or if, from the proofs, it appears to a legal certainty that the plaintiff is not entitled to that amount." Dolin v. Asian Am. Accessories, Inc., 449 F. App'x 216, 218 (3d Cir. 2011). In cases initiated in federal

27

court, as opposed to those removed from state court, "a
defendant challenging the sufficiency of the plaintiff's amount
in controversy (through a motion to dismiss for lack of subject-
matter jurisdiction under Rule 12(b)(1) of the Federal Rules of
Civil Procedure) is required to demonstrate, to a legal
certainty, that the plaintiff cannot recovery an amount above
the jurisdictional threshold." Heffner v. LifeStar Response of
New Jersey, Inc., Civ. 13-00194, 2013 WL 5416164, at *6 (E.D.
Pa. Sept. 27, 2013) (citing Onyiuke v. Cheap Tickets, Inc., 435
Fed. Appx. 137, 139 (3d Cir. 2011)).

    In the present action, 7-Eleven has alleged that the amount
in controversy on each of the counts exceeds $75,000 exclusive
of interest and costs.[15] (Am. Compl. ¶ 8.) Defendants do not
argue that 7-Eleven is not entitled to an amount in excess of
$75,000 for its breach of contract claim under New Jersey law.
Defendants only argue that, consistent with the consent order
granting 7-Eleven a permanent injunction, Mohammad Younes
submitted an affidavit stating that no more than $2,026.08 worth
of 7-Eleven products were sold at the 24-7 Foodmart, which
establishes that 7-Eleven's damages are limited to this amount.
(Def. Ex. B [Docket Item 29-3] ¶ 7.) Even if the Court considers
this affidavit, it is insufficient to demonstrate to a legal

---

[15] 7-Eleven has also adequately pleaded complete diversity of
citizenship. (Am. Compl. ¶¶ 9-15.)

certainty that 7-Eleven cannot recover in excess of $75,000
based on breach of contract by Sam Younes. In addition to the
fact that Mr. Younes' affidavit admits that Defendants did not
maintain sales records by item at the 24-7 Foodmart, which
renders his estimate vulnerable to dispute, Defendants have
provided no legal basis to conclude that 7-Eleven's recovery for
breach of contract would be limited to the value of the 7-Eleven
products sold at the 24-7 Foodmart. Consequently, the Court will
deny Defendants' motion to the extent it seeks dismissal of 7-
Eleven's breach of contract claim against Sam Younes for lack of
subject matter jurisdiction.[16]

**V.  CONCLUSION**

In light of the foregoing, the Court will grant Defendants'
motion to dismiss to the extent it seeks dismissal of 7-Eleven's
claims for fraud, civil conspiracy, and trademark infringement.
However, 7-Eleven's trademark infringement claims will be
dismissed without prejudice to 7-Eleven's right to amend its

---

[16] Because Defendants have failed to establish to a legal
certainty that 7-Eleven's damages for its breach of contract
claim could not satisfy the amount in controversy requirement
for diversity jurisdiction, there is no need to address
Defendants' argument regarding supplemental jurisdiction.
Indeed, if 7-Eleven files an amended complaint curing the
deficiencies identified herein, the Court's analysis of whether
to exercise supplemental jurisdiction over the breach of
contract claim against Sam Younes would change. As such,
expressing an opinion as to supplemental jurisdiction at this
point would be premature.

trademark infringement claims. The Court will deny Defendants'
motion to dismiss to the extent it seeks dismissal of 7-Eleven's
breach of contract claim against Sam Younes. An accompanying
Order will be entered.


**April 17, 2015**                          **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       Chief U.S. District Judge

30